# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# FORT WAYNE DIVISION

| MIKEL R. WILKINS, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | CAUSE NO.: 1:16-CV-91-TLS |
| COMMISSIONER OF THE SOCIAL SECURITY ADMINISTRATION, | ) ) ) | |
| Defendant. | ) | |

## OPINION AND ORDER

The Plaintiff, Mikel R. Wilkins, seeks review of the final decision of the Commissioner of the Social Security Administration denying her application for Supplemental Security Income (SSI). The Plaintiff claims that she would be unable to maintain substantial gainful employment due to limitations brought about by her asthma, obesity, and type I diabetes.

## PROCEDURAL HISTORY

In September 2012, the Plaintiff, at age nineteen, filed a claim for SSI, alleging disability beginning on the application date. The state agency responsible for making disability determinations on behalf of the Commissioner denied the Plaintiff's claim initially and upon reconsideration. The Plaintiff sought appeal of those determinations and filed a request for a hearing before an Administrative Law Judge (ALJ). In May 2014, the Plaintiff, who was represented by an attorney, appeared and testified at a hearing before the ALJ. A vocational expert (VE) also testified. In October 2014, the ALJ issued a written decision, in which she concluded that the Plaintiff was not disabled because she was capable of performing unskilled light work as a cashier, retail marker, or sales attendant. The Plaintiff sought review of the ALJ's

decision by the Appeals Council. In January 2016, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. *See* 20 C.F.R. § 404.981. The Plaintiff seeks judicial review under 42 U.S.C. § 405(g).

## THE ALJ'S FINDINGS

The Social Security regulations set forth a five-step sequential evaluation process to be used in determining whether the claimant has established a disability. *See* 20 C.F.R. § 404.1520(a)(4)(i)-(v); *see also* 42 U.S.C. § 423(d)(1)(A) (defining a disability under the Social Security Act as being unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months"); *id.* § 423(d)(2)(A) (requiring an applicant to show that his "impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy"). The first step is to determine whether the claimant is presently engaged in substantial gainful activity (SGA). Here, the ALJ found that the Plaintiff was not engaged in SGA, having never made any attempt at work, so she moved to the second step, which is to determine whether the claimant had a "severe" impairment or combination of impairments.

An impairment is "severe" if it significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a). The ALJ determined that the Plaintiff's severe impairments were obesity, insulin-dependent diabetes mellitus, and asthma.

The ALJ also discussed the Plaintiff's depression, which was brought on by a stillborn birth in May 2012, but concluded that it did not cause more than minimal limitations in the Plaintiff's ability to perform basic mental work activities for a twelve-month period.

At step three, the ALJ considered whether the Plaintiff's impairments, or combination of impairments, met or medically equaled the severity of one of the impairments listed by the Administration as being so severe that it presumptively precludes SGA. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1. The ALJ concluded that the Plaintiff's impairments did not meet Listing 3.03 for asthma. Her diabetes did not meet a listing because there is no separate listing for diabetes, and the Plaintiff did not have diabetic symptoms that met or equaled any listing under another body system. The ALJ noted that there was no listing specifically addressing obesity, but that the ALJ would consider the aggravating effects of the Plaintiff's obesity on her other impairments.

Next, the ALJ was required, at step four, to determine the Plaintiff's residual functional capacity (RFC), which is an assessment of the claimant's ability to perform sustained work-related physical and mental activities in light of her impairments. SSR 96–8p, 1996 WL 374184, at *1 (July 2, 1996). The ALJ concluded that the Plaintiff had the RFC to perform light work as defined in 20 C.F.R. § 416.967(b), which meant she could lift, carry, push, and pull twenty pounds occasionally and ten pounds frequently, and that she could stand or walk for six hours in an eight-hour day, as well as sit for six hours in an eight-hour day. For the Plaintiff's obesity, the ALJ imposed additional restrictions of avoiding concentrated exposure to wetness, and hazards of unprotected heights and slippery work conditions, and also imposed limitations of only occasionally climbing ramps and stairs, balancing, stooping, crouching, kneeling, or crawling. The Plaintiff could never climb ladders, ropes, or scaffolds. To address the limitations

caused by her asthma, the ALJ concluded that the Plaintiff had to avoid exposure to extreme cold, and irritants such as fumes, odors, dust, gases, poorly ventilated areas, and chemicals.

In making these findings, the ALJ considered the Plaintiff's testimony regarding the symptoms caused by her diabetes, particularly her testimony that her sugar level is high about four times per week, and that two to three times per week it would cause her to be unable to work. The ALJ acknowledged that the Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms. However, she did not find credible the Plaintiff's asserted inability to function two to three days per week. Rather, the ALJ thought that the record supported potential absences of one day per month. The ALJ gave great weight to the opinions of the state agency consultants that the Plaintiff could perform light work, but added more restrictive postural limitations due to obesity, and limitations on pulmonary irritants due to the Plaintiff's asthma.

Although the Plaintiff had no past relevant work, at the final step of the evaluation, the ALJ determined that the Plaintiff could perform work as a cashier, a retail marker, or a sales attendant. These jobs were typically performed at the light level, and were unskilled. The ALJ noted the VE's testimony that an absence rate of one day per month would generally be tolerated. "Thus, even if that limitation were added to the [Plaintiff's] residual functional capacity, [she] would not be precluded from all work." (R. 26.)

## STATEMENT OF FACTS

The Plaintiff has a high school diploma, but no employment history. She was nineteen years old when she applied for SSI. The Plaintiff was diagnosed with diabetes in 2006 at the age

4

of twelve and had suffered from chronic asthma for years. According to the Plaintiff, her conditions became disabling on September 10, 2012.

Prior to this alleged onset date, the Plaintiff saw Dr. Pamela Thomas for treatment and control of her diabetes. During her November 2010 visit, Dr. Thomas noted that the Plaintiff had missed some of her appointments and seemed to be taking only half the prescribed insulin dose based on pharmacy records. Further, Dr. Thomas observed that the Plaintiff's glucometer showed no useful blood sugar testing as the meter had the wrong date and time and the Plaintiff had only done sporadic testing. Dr. Thomas commented that the Plaintiff was "non-compliant with all aspects of her therapy." (R. 226.) Dr. Thomas impressed upon the Plaintiff and her father the importance of meal planning, administering adequate insulin doses, and checking blood sugars four times per day.

The Plaintiff did not continue to see Dr. Thomas after 2010, but relied on her primary care physician, Dr. Ashraf Hanna, to treat her diabetes. Her treatment records from December 2010 through 2011 show that she continued to experience wide fluctuations with her blood glucose and also had occasional flare-ups of asthma symptoms. The Plaintiff reported that her swings in blood sugar sometimes caused dizziness or headaches, but she denied experiencing any tingling, numbness, fainting, or vomiting. (R. 306, 312, 325, 332, 346.) Still, the Plaintiff went to the emergency room five times in 2011 for asthma attacks (R 360–418, 515, 541–88) and episodes of severe hyperglycemia (R. 190, 250–61, 481–501). Each time she was treated with steroids and/or intravenous insulin until she was stabilized and discharged within a couple of days. (*Id.*)

After the Plaintiff learned she was pregnant with her first child in October 2011, she

began seeing endocrinologist Dr. David Sorg to help better control her diabetes. Dr. Sorg's nurse practitioner, Loretta Bazur-Persing, counseled the Plaintiff on nutrition, carbohydrate counting, and proper calculations for insulin dosing. The Plaintiff continued to experience trouble regulating her blood sugars. (R. 520, 555.) However, the Plaintiff had no severe hyperglycemic incidents requiring treatment in the emergency room for almost an entire year, between October 2011 and September 2012. The Plaintiff was hospitalized, however, in May 2012 because she lost her first child, who she delivered stillborn three weeks before her due date. (R. 102, 495.)

In early September 2012, the Plaintiff went to the emergency room for an asthma attack. (R. 478–90.) The doctor noted that the Plaintiff experienced "remarkable improvement" from the breathing treatments she received and the Plaintiff insisted on being discharged the same day. (R. 481.) Because her symptoms persisted, however, she returned to the emergency room the following day and was admitted for two days until she stabilized. (R. 449–50, 459–60.) When she was admitted, the doctors noted that her blood sugars had also spiked and that her sudden onset of hyperglycemia was likely due to the steroids she had been prescribed in the emergency room the day before. (R. 462.) The Plaintiff applied for SSI benefits three days after being discharged. (R. 17.)

The Plaintiff was hospitalized twice more in October and December 2012 for similar complaints regarding her asthma and hyperglycemia. (R. 404–07, 1068–71, 1084–87.) In October 2012, she was admitted for two days and given intravenous insulin and intensive breathing treatments until her sugars came down and her breathing returned to normal. (R. 404–07, 419–21.) The attending doctor noted that her asthma attack was likely triggered by a change in the weather and that her hyperglycemia was again linked to the use of an inhaled

6

corticosteroid. (R. 419–21.) Her December hospitalization was caused by an acute allergic reaction to fish, which, in turn triggered respiratory distress and a breakout of hives. (R.1068–71, 1084–87.) While she was in the hospital, the doctors noted that her sugars were elevated but that they were stabilized and adequately controlled with the insulin regimen in the hospital. (R. 1087.)

On December 4, 2012, the Plaintiff saw consultative examiner Dr. B.T. Onamusi. In describing her activities, the Plaintiff told Dr. Onamusi that she could walk at a fast pace for 30 minutes before needing to stop and use her inhaler and was capable of doing housework, laundry, and grocery shopping. Though she had not reported similar symptoms to her treating doctors, the Plaintiff told Dr. Onamusi that she experienced symptoms of numbness and tingling in her hands and feet and calf pain from her diabetes. The Plaintiff stated that, about once a month, she experienced hypoglycemia and felt weak, lightheaded, irritable, and shaky, but that her diabetes improved overall in 2012 compared to 2011. Dr. Onamusi noted that she had no problems with her attention span or memory and could walk, squat, and kneel without issue and had good grip strength. Based on his examination and review of her records, Dr. Onamusi opined that the Plaintiff was capable of engaging in light work and noted that there was no clinical evidence of micro or macrovascular complications from her diabetes.

Later the same month, consultative psychiatric examiner, Dr. Andrew Miller, examined the Plaintiff. (R. 975–78.) He assessed a Global Assessment of Functioning score of 64, indicating only mild symptoms.

In 2013, the Plaintiff became pregnant with her second child. The Plaintiff continued to see Dr. Hanna, Dr. Sorg, and Nurse Practitioner Bazur-Persing for management of her asthma,

7

diabetes, and for prenatal care. Dr. Hanna's treatment records from July through December 2013 consisted mainly of wellness check-ups and prenatal care. (R. 1288–1372.) Nurse Practitioner Bazur-Persing's August notes indicate that the Plaintiff checked her blood sugars at least four times per day. "There is no real trend to her blood sugars, and they are really quite erratic ranging from 123 to 497." (R. 1259.) During another exam, it was noted that her ranges were between 44 and 525, with her best values being "first thing in the morning." (R. 1255.) Athough the Plaintiff reported that she was eating right and closely monitoring her carbohydrates, Bazur-Persing thought that it was "clear from her blood sugars that something is not consistent" and she was not convinced that the Plaintiff was following the prescribed regimen. (R. 1259, 1255–57; *see also* R. 1257 ("It will be my hope that if we can hone in on the carbohydrate counting, hopefully we can get better control of her diabetes during this pregnancy."); R. 1261 ("I am not always convinced that she is following the plan that we have set forth.").) The Plaintiff said that her high sugars occasionally caused headaches "but nothing that is concerning to her." (R. 1260.)

By September 2013, one year after her alleged onset date, Ms. Bazur-Persing noted marked improvement, although the Plaintiff still experienced some glucose swings. (R. 1229–31, 1250–52.) They continued to work on stabilizing her glucose levels in October 2013, but Bazur-Persing suspected that the Plaintiff was still not accurately calculating her carbohydrate intake. During her appointment on October 31, 2013, Bazur-Persing noted that, based on information she had recently received from the nutritionist, the Plaintiff had been consuming more carbohydrates than she had been led to believe and that these findings "likely explain the inconsistencies [in] blood sugars versus food consumption as well as shed light on the difficulty we have had helping the patient." (R. 1204–05.) The Plaintiff denied any unusual headaches or

8

change in her vision. She attributed her increased fatigue as a normal condition of her pregnancy. Bazur-Persing also commented in her treatment note that she had been

> very specific with the patient with regard to calling the clinic or myself should she run into difficulty securing her medication or if she should have extremes in highs or lows in her blood sugars. I have done this after every visit, but as of yet, the patient does not call the clinic for guidance.

(R. 1206.) During subsequent visits with Bazur-Persing in November and December 2013, Bazur-Persing noted that the Plaintiff denied unusual headaches or vision changes, and that she had never complained of dizziness. (R. 1173–75, 1201–03.)

In 2013, the Plaintiff went to the emergency room five times for asthma attacks or hyperglycemia. First, in February, the Plaintiff was admitted to the hospital after going to the emergency room experiencing cold-like symptoms for several days. The doctors observed that she did not have any wheezing or shortness of breath, but noted that her sugars were high. (R. 1045.) The Plaintiff reported that her sugars had been elevated for three or four days since she started taking cough syrup, but stated that otherwise her sugars had "always been less than 200 or 150." (*Id.*) She was treated with intravenous fluids, insulin and medication for her upper respiratory infection and discharged the next day. (R. 992–93.)

The, she was treated on an outpatient basis in April (R. 1008–21), September (R. 1234–41), October (R. 1204), and November, 2013 (R. 1188–95), and discharged after she was given breathing treatments and insulin. The April emergency room visit was prompted by upper respiratory symptoms, but the Plaintiff also had high blood glucose. In September, the Plaintiff had emergency room treatment for asthma and diabetes. In October, she reported to the emergency room with abdominal pain and hyperglycemia. Her trip to the emergency room on November 3, 2013, was prompted by shortness of breath that was not relieved with her nebulizer

9

at home. The steroids that were administered raised her blood sugar.

The Plaintiff was hospitalized once more, in January 2014, for one night when her asthma flared. Although her blood glucose was relatively low (195) when she was admitted (R. 1117), as had been the pattern, her steroid-based asthma treatments triggered hyperglycemia during her hospitalization and her blood sugar spiked to over 400 (R. 1118). Although the doctors recommended she stay for an additional day to get her blood sugar stabilized, the Plaintiff insisted on going home to attend a previously scheduled appointment with her primary care doctor. (R. 1118.) Her final appointment before her hearing was a visit with Bazur-Persing on February 28, 2014. The nurse remarked that she felt "that how the patient tells me she is eating is not necessarily true and often she might be eating or drinking things during the day that would raise her blood sugar" and this had been confirmed by the nutritionist. (R. 1105.) This treatment record also reflects that the Plaintiff had consistently denied any discomfort or altered sensation in her extremities, had not experienced any unusual headaches recently, and her asthma was well controlled; she rarely even needed her rescue inhaler. (R. 1106.)

At the May 15, 2014, hearing before the ALJ, the Plaintiff testified that she lives with her father and younger brother and her infant daughter, who was born in December 2013. According to Plaintiff, she spends her days taking care of her daughter, doing light housework, attending medical appointments, taking walks, making meals, and socializing with friends and family. The Plaintiff testified that she dropped out of high school in the eleventh grade because her diabetes was so bad that she would often experience hyperglycemia and feel dizzy or faint at school. She stated that the school nurse encouraged her to home school because of her medical conditions and that she eventually obtained her high school diploma at age 20. The Plaintiff testified that

her experience in high school is what made her believe that she could not work. She said that she did not want to get a job and start it if there was a chance she would have to stop working. The Plaintiff described her hyperglycemic symptoms as body aches, tingling, nausea, and a "weird feeling in [her] head." (R. 49.) She said that she experienced these hyperglycemic episodes about two or three times per week and that, when she did, she would call her doctor for instructions of how to treat it—whether she should take extra insulin or drink water or both. (R. 49, 54.) The Plaintiff testified that she would then wait two hours and if her blood sugars had not gone down, she would go to the emergency room. (R. 50.) She added that when she did feel sick from these sugar spikes, her family had to help her with the care of her daughter. (R. 50–51.) Regarding her asthma, the Plaintiff admitted it was relatively well controlled. (R. 48, 57.)

## STANDARD OF REVIEW

The decision of the ALJ is the final decision of the Commissioner when the Appeals Council denies a request for review. *Liskowitz v. Astrue*, 559 F.3d 736, 739 (7th Cir. 2009). A court will affirm the Commissioner's findings of fact and denial of disability benefits if they are supported by substantial evidence. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It must be "more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). Even if "reasonable minds could differ" about the disability status of the claimant, the court must affirm the Commissioner's decision as long as it is adequately supported. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

It is the duty of the ALJ to weigh the evidence, resolve material conflicts, make independent findings of fact, and dispose of the case accordingly. *Perales*, 402 U.S. at 399–400. In this substantial-evidence determination, the court considers the entire administrative record but does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute the court's own judgment for that of the Commissioner. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Nevertheless, the court conducts a "critical review of the evidence" before affirming the Commissioner's decision, and the decision cannot stand if it lacks evidentiary support or an inadequate discussion of the issues. *Id.*

The ALJ is not required to address every piece of evidence or testimony presented, but the ALJ must provide a "logical bridge" between the evidence and the conclusions. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009). If the Commissioner commits an error of law, remand is warranted without regard to the volume of evidence in support of the factual findings. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

## ANALYSIS

The Plaintiff presents two issues for review. First, she complains that the ALJ "failed to properly address SSR 96-7p and ignored evidence supportive of [the Plaintiff's] subjective symptoms." (Pl.'s Br. 7, ECF No. 12.) The Plaintiff describes the second issue as a failure to address all the evidence, both in favor of and against a finding of disability:

> The ALJ failed to address the implications of Wilkins' fluctuating symptoms associated with her severely uncontrolled diabetes mellitus and that she has several "bad days" each week where her functional abilities are decreased, likely resulting in excessive absences from steady employment. Just because she did not go to the emergency room every time her blood sugars were too high does not mean that Wilkins suffered no negative symptoms any other day. Remand is

12

necessary to properly address Wilkins subjective reports of good versus bad days and the impact this would have on her employability.

(*Id.*)

The Court finds that the two issues, as presented by the Plaintiff, are related. The Plaintiff's claim of disability rests mainly on her allegations concerning the frequency and severity of the symptoms associated with her diabetes. The overriding issue is whether the ALJ adequately supported her decision not to credit the Plaintiff's testimony that she would be unable to work two to three days per week due to functional limitations caused by high blood sugar.

The regulations and SSR 96-7p set forth the Agency's policy for evaluating a claimant's symptoms and assessing the credibility of her statements.[1] The Plaintiff argues that the ALJ's credibility assessment was cursory and failed to specifically articulate her consideration for any of the factors listed under SSR 96-7p. (Pl's Br. 10–15.) According to the Plaintiff, the ALJ merely offered a boilerplate explanation and a brief summary of the evidence and testimony without properly articulating her reasons for discounting the Plaintiff's allegations. The Court does not agree. Although the ALJ's decision included the much-criticized boilerplate language, simply using it "does not automatically undermine or discredit the ALJ's ultimate conclusion if [she] otherwise points to information that justifies [her] credibility determination." *Pepper v. Colvin*, 712 F.3d 351, 367–68 (7th Cir. 2013). Put differently, the ALJ's use of boilerplate

---

[1] SSR 96-7p was recently replaced with a new ruling, SSR 16-3p, Evaluation of Symptoms in Disability Claims, which more closely follows the Agency's regulatory language regarding symptom evaluation. *See* SSR 16-3P, 2016 WL 1119029, at *1 (Mar. 16, 2016). The substantive aspects of SSR 16-3p do not apply retroactively, so SSR 96-7p still governs this case. However, SSR 16-3p clarifies SSA's existing policy by explicitly stating that an ALJ need not discuss all of the regulatory factors that she considers, except as she finds them pertinent to the case. *Id.* at *7 ("If there is no information in the evidence of record regarding one of the factors, we will not discuss that specific factor in the determination or decision because it is not relevant to the case").

language is reversible error only if she did not also give sufficient reasons, grounded in evidence in the record, to support her ultimate determination. *See id.*; *cf. Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001) (noting that SSR 96-7p requires specific reasons for the credibility finding, and that it is not sufficient for the ALJ to make a single, conclusory statement about credibility but neither is it sufficient to simply recite the regulatory factors).

One of the claims the Plaintiff made during the May 2014 hearing was that she frequently called Dr. Sorg's office to get instructions when her blood sugar was high.

> Q. When [your blood sugar] gets that high, what do you do?
> A. I call my doctor. I'll get to the phone, call my doctor, and I'll see what she tell me. She might say take some extra insulin; she might say drink a lot of water; or do both. I call back in two hours. If it's not back to where it's supposed to be at, I go to the ER. Because lately it's been going down, but it shoot right back up a lot.

(R. 49–50; *see also* R. 55 (testifying that she calls the doctor's office two to three days per week).) The ALJ noted this testimony, but reasoned that the records did not corroborate the Plaintiff's account. The ALJ wrote:

> A treatment entry from October 31, 2013, states that Dr. Sorg urged the claimant to call his office if she experienced extreme highs or lows in her blood sugars. He noted that he had done this after every visit, but as of yet, the claimant had not called the clinic for guidance (Ex. 8F). The evidence in the record does not show any calls to Dr. Sorg after October 2013 either.

(R. 23.)[2] This analysis of specific testimony refutes the Plaintiff's argument to this Court that the ALJ offered only boilerplate language without explaining which of the claimant's statements were not credible. The Plaintiff argues that, just because the Plaintiff "did not go to the hospital

---

[2] Additionally, because the Plaintiff's medical records did not reflect that she had made such telephone calls, the ALJ gave the Plaintiff's counsel additional time to submit evidence regarding whether it was the doctor's practice to log such telephone calls. The record does not appear to have been supplemented with this evidence.

14

or call her doctor every time her blood sugar is high does not mean that she does not suffer multiple days of symptoms associated with hyperglycemia." (Pl.'s Br. 15.) While this may be true, the Plaintiff herself stated that she called Dr. Sorg's office when her blood sugar got too high, *and* that she went to the emergency room if she could not get it down after talking to the nurse practitioner. Yet, Dr. Sorg's office has no records of such calls in the entire year following the Plaintiff's alleged onset date, despite the repeated invitation from the doctor to call. Additionally, she only went to the emergency room for blood-sugar-related events three times after her initial evaluation with Dr. Sorg, all which occurred while she was pregnant. The ALJ's discussion of the treatment records is a specific reason in support of her determination that the Plaintiff's assertions about her symptoms were not entitled to be taken at face value.

The ALJ noted that the Plaintiff's total hospitalizations (15 days in two years) did not support the Plaintiff's allegations of inability to function two or three days a week. She also noted that the Plaintiff had not required diabetes related treatment in a hospital facility since October 30, 2013, which was nearly a year before the ALJ's written decision. The ALJ stated that, although Dr. Sorg's notes indicated that the Plaintiff periodically had blood sugar readings in the 300s and did not go to the hospital, the record did not establish the functional limitations of those high readings. This Court's review of the treatment notes bears this out. It was appropriate for the ALJ to consider the Plaintiff's statements to her medical providers. The ALJ also highlighted the Plaintiff's most recent record of diabetes treatment, an appointment with nurse practitioner Bazur-Persing on February 28, 2014. The ALJ noted that "Bazur-Persing stated that the claimant does not necessarily give accurate reports of her eating and often might be eating and drinking items that would raise her blood sugar." (R. 24.) The ALJ may deem an

15

individual's statements less credible if medical reports or records show that the individual is not following the treatment as prescribed. *See* SSR 96–7p, 1996 WL 374186, at *7; *Craft*, 539 F.3d at 679. However, such evidence should not negatively affect an individual's credibility if there are good reasons for the failure to complete the plan. *Craft*, 539 F.3d at 679. Therefore, an ALJ may need to question the individual at the administrative proceeding to determine whether there are good reasons the individual did not seek medical treatment or fully comply with prescribed treatment. *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012). Here, the Plaintiff did not admit to poor compliance. Instead, as noted in the ALJ's decision, the Plaintiff testified that she ate right, drank fluids, and walked to control her blood sugar. (R. 22.) Accordingly, it would not have been logical for the ALJ to ask her to justify her noncompliance.

The Plaintiff faults the ALJ for failing to investigate the impact of the Plaintiff's dependence and the side effects of increased dosages of drugs. (Pl.'s Br. 13.) However, the Plaintiff did not attempt to present any evidence related to the impact of her medications, and does not attempt to highlight to this Court what she believes might have been discovered. The Plaintiff has the burden of proof regarding her functional limitations, and the Court does not find any error in the ALJ's failure to investigate.

The inconsistent statements, lack of recorded symptoms in the medical records to match the Plaintiff's testimony, and the failure to adhere to dietary restrictions is relevant evidence that a reasonable person might accept as adequate to support the conclusion that the Plaintiff was not incapacitated by high blood sugar two to three days per week. The AJL explained her adverse-credibility finding with specific reasons "supported by the record." *Minnick v. Colvin*, 775 F.3d 929, 937 (7th Cir. 2015); *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006)

("Only if the trier of fact grounds his credibility finding in an observation or argument that is unreasonable or unsupported . . . can the finding be reversed."). She has "explain[ed] her decision in such a way that allows [the court] to determine whether she reached her decision in a rational manner, logically based on her specific findings and the evidence in the record." *McKinzey v. Astrue*, 641 F.3d 884, 890 (7th Cir. 2011). This Court does not reweigh the evidence or substitute its judgment for that of the ALJ's.

## CONCLUSION

For the reasons stated above, the decision of the Commissioner is AFFIRMED.

SO ORDERED on February 8, 2017.

                                         s/ Theresa L. Springmann
                                        CHIEF JUDGE THERESA L. SPRINGMANN
                                        UNITED STATES DISTRICT COURT